EDWARD MONREAL, JR., Plaintiff-Appellant, v. WATERBURY-FARREL FOUNDRY AND MACHINERY COMPANY, Defendant-Appellee.

First District (4th Division)    No. 1—93—3368

Opinion filed February 9, 1995.—Rehearing denied March 10, 1995.

Donald X. Murphy, of Chicago, for appellant.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Michael A. Pollard, L. Michael Tarpey, and Adriane W. Burkland, of counsel), for appellee.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

The plaintiff, Edward Monreal, Jr., was injured on May 20, 1976, while he was operating a press manufactured by the defendant, Waterbury-Farrel Foundry & Machinery Company. The plaintiff sought recovery against the defendant on a theory of strict product liability. The matter was tried before a jury which was unable to reach a verdict after three days of deliberation resulting in the declaration of a mistrial. Thereafter, pursuant to the defendant's motion, the trial court entered judgment in favor of the defendant notwithstanding the mistrial. In so doing, the trial court held that the transformation of the press after it left the defendant's control, from a mechanically operated machine to one operated electrically by the

use of palm buttons, relieved the defendant of all liability for the plaintiff's injury. The plaintiff has appealed and, for the reasons which follow, we reverse and remand for a new trial.

The standard to be employed in directing verdicts or entering judgments *non obstante veredicto* is well settled. "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) It is by this standard that a trial court must rule on such a motion, and it is also by this standard that we must judge the propriety of the trial court's action in that regard. Guided by the admonition of *Pedrick*, we have examined the evidence introduced upon the trial of this cause.

When he was injured, the plaintiff was operating a press originally manufactured and sold by the defendant in 1919. The plaintiff was engaged in a metal-stamping process that required him to manually feed two- to three-pound pieces of metal into the press with his right hand, activate the press using both hands to depress two palm buttons, and after the press cycled, remove the finished piece from the machine with his left hand. According to the plaintiff, when his right hand was under the ram, the press activated even though he did not press the palm buttons, causing the ram to descend and severing $2^1/2$ fingers on his right hand.

As originally manufactured, the press at issue was a $3^1/2$-ton capacity, single acting, open-back, inclinable press used to stamp, cut, or shape metal. The machine could be powered individually by an electric motor or by a counter-shaft connected to a main shaft used to power multiple machines. The press was designed to be operated either by depressing a foot pedal or moving a mechanical hand lever connected to a clutch. The press could be outfitted with a constant rotation clutch or a single revolution clutch containing either an expansion or a compression spring. When the pedal was depressed or the hand lever moved, the clutch rotated a crank shaft causing a ram fitted with the user's die to descend. The metal fed into the press is cut, shaped or stamped by the action of the ram and die descending upon it as it rests on a base plate. After descending upon the metal, the ram would retract to its elevated position. A single descent and retraction of the ram is termed a cycle. Metal could be fed into the machine in several different ways: by hand, mechanical roll, dial, hopper, or shoots.

At the time of the plaintiff's accident, the press in issue had been

converted from a manually operated machine to an electrically oper-
ated machine activated by depressing two palm buttons located on
the base plate of the machine which were installed after the press
left the defendant's control. When both palm buttons were depressed,
the press was electronically activated and took four seconds to
complete a cycle. Additionally, the plaintiff's employer had installed
an adjustable point-of-entry guard which acted as a barrier to the
area of the descending ram. The adjustable guard could be raised or
lowered to increase or decrease external access to the ram area. At
the time of the plaintiff's injury, the guard was adjusted in such a po-
sition so that there was a six-inch unprotected opening to the ram
area.

The plaintiff's expert witness, Robert W. Robinson, testified that
the press was unreasonably dangerous when manufactured because
it lacked point-of-entry guards which were available in 1919 and a
permanent warning to the operator that the machine was capable of
an unintended repeat of its cycle. There is no dispute that the press
as manufactured included neither. Robinson testified that the instal-
lation of palm buttons which converted the machine from manual to
electric activation did not alter the basic operation of the press. In
his opinion, neither the installation of the palm buttons nor the
adjustable guard adequately protected an operator at the point of
entry to the ram area. Classifying the press as unifunctional, he
testified that the press could have been equipped with pull-back de-
vices for the operator's arms or a barrier guard that enclosed the
ram area on four sides with a front section that could be raised as
metal was inserted, interlocked with a trip mechanism that would
prevent the press from operating until it was closed. Robinson was of
the opinion that the press was capable of unintended recycling and,
based upon the plaintiff's testimony that he had not pressed the palm
buttons when the press cycled causing his injury, that the press did
in fact experience an unintended recycle when the plaintiff was
injured.

The defendant's expert witness, Ralph Barnett, was of the opinion
that the defendant's press was not unreasonably dangerous when
manufactured. He testified that the machine was a multifunctional
press incapable of universal guarding. It was his opinion that, absent
information relating to the in-feed method, the out-feed method, and
the type of die to be used, the manufacturer could not equip the press
with an effective guarding system and, therefore, the responsibility
for providing point-of-entry guarding fell upon the user. He disagreed
with Robinson's opinions relating to pull-back devices and barrier
guards. He further opined that the installation of palm buttons in a

location over which the operator was required to reach when taking a stamped piece from the machine in itself created a safety hazard due to the possibility of accidental activation. In his opinion, the press did not recycle at the time of the plaintiff's injury. Barnett admitted that the adjustable guard on the machine at the time of the plaintiff's accident was not an adequate point-of-entry guard because the opening to the ram area was sufficient to allow an operator to insert his hand.

■ To recover under a strict product liability theory, a plaintiff must establish that his injury was a proximate result of an unreasonably dangerous condition of the product existing at the time that the product left the control of the defendant. (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401; *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.) In this case, it was the plaintiff's theory that the defendant's press was unreasonably dangerous due to the absence of point-of-entry guards and a warning to the operator that the machine was capable of an unintended recycle. Failure to incorporate a necessary safety device can render a product unreasonably dangerous for strict liability purposes (*Doser v. Savage Manufacturing & Sales, Inc.* (1990), 142 Ill. 2d 176, 568 N.E.2d 814), as can the failure of a manufacturer to warn potential users of a product's dangerous propensities (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 402 N.E.2d 194). There is no doubt that when it left the defendant's control, the press at issue lacked both point-of-entry guards and a permanent warning as to the possibility of an unintended recycle.

■ The fact that the defendant's press may have been multifunctional in nature, a characterization disputed by the plaintiff's expert, is not necessarily decisive of the issue of whether it was unreasonably dangerous because of the lack of adequate guarding. (*Doser*, 142 Ill. 2d at 198-99; *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 319 N.E.2d 232.) This proposition is especially true in cases such as this, where the plaintiff's expert has testified to the type of guards that could have been incorporated into the product when manufactured to render it safe. Based upon the contradictory testimony of the expert witnesses in this case, the issues of whether the defendant's press was unifunctional or multifunctional and whether it was unreasonably dangerous when manufactured due to the lack of point-of-entry guards were both questions of fact for a jury to decide. *Doser*, 142 Ill. 2d at 199.

■ If a product is unreasonably dangerous when it leaves the defendant's control but the danger-causing deficiency is thereafter remedied and the product rendered safe, there can be no proximate

causal relationship between the condition of the product when it left the defendant's control and a post-remedial action injury. (See *Rios,* 59 Ill. 2d at 85-86.) Obviously, the converse of this rule is also true. If the subsequent remedial action is inadequate to correct an unreasonably dangerous condition, the proximate causal connection between the condition of the product at the time that it left the defendant's control and any subsequent injury suffered as a consequence remains unbroken even under circumstances where the attempted remedial action may have also contributed to the injury suffered. (See *Byrne v. SCM Corp.* (1989), 182 Ill. App. 3d 523, 538 N.E.2d 796; *Medina v. Air-Mite Devices, Inc.* (1987), 161 Ill. App. 3d 502, 515 N.E.2d 770.) Because both expert witnesses criticized the adjustable guard and the palm buttons as point-of-entry safety devices, neither device acted in any way to remedy the lack of guarding that existed on the subject press at the time it left the control of the defendant.

■ A predicate for the imposition of strict product liability is the requirement that the product reach the "user or consumer without substantial change in the condition in which it is sold." (Restatement (Second) of Torts § 402A(1)(b), at 348 (1965).) Consequently, where the intervention of a third party's defective unforeseen alteration renders the product unreasonably dangerous and causes the injury, the original manufacturer is not liable. (*Augenstine v. Dico Co.* (1985), 135 Ill. App. 3d 273, 481 N.E.2d 1225; *DeArmond v. Hoover Ball & Bearing, Uniloy Division* (1980), 86 Ill. App. 3d 1066, 408 N.E.2d 771; *Gasdiel v. Federal Press Co.* (1979), 78 Ill. App. 3d 222, 396 N.E.2d 1241; *Coleman v. Verson Allsteel Press Co.* (1978), 64 Ill. App. 3d 974, 382 N.E.2d 36.) However, each of the cases so holding has a common factual thread: namely, the product in issue was not unreasonably dangerous when it left the control of the manufacturer. It was the unforeseen alteration of the product by the third party that rendered the product unreasonably dangerous and caused the injury. (See *Augenstine,* 135 Ill. App. 3d at 276; *DeArmond,* 86 Ill. App. 3d at 1071; *Gasdiel,* 78 Ill. App. 3d at 227; *Coleman,* 64 Ill. App. 3d at 981.) When, however, a product is unreasonably dangerous as manufactured, the fact that a defective alteration also contributes to a plaintiff's injury will not act to absolve the manufacturer of liability. *Wells v. Web Machinery Co.* (1974), 20 Ill. App. 3d 545, 315 N.E.2d 301; see also *Coleman,* 64 Ill. App. 3d at 980.

■ In this case, the trial court found that the alteration of the press introducing the palm buttons as the means of activation constituted a substantial change in the product absolving the defendant of liability as a matter of law. Based upon the evidence introduced at trial, we disagree.

The plaintiff's expert testified that the installation of palm buttons as the means of activating the press did not change its basic operation. The electrical device to which the palm buttons were connected and the foot pedal or mechanical lever that originally accompanied the press were attached to the very same rods that activated the machine's clutch. Other than the means of activation, Robinson testified that the press operated as manufactured. Both experts testified that the installation of the palm buttons did not protect the operator at the point of entry to the ram area. The fact that the defendant's expert testified that the palm buttons in themselves constituted a safety hazard as installed did nothing more than create a triable issue of fact as to the proximate cause of the plaintiff's injury in the face of the testimony of the plaintiff's expert that the press was unreasonably dangerous as manufactured due to the lack of point-of-entry guards.

Viewing the testimony in this case in a light most favorable to the plaintiff, we find the issues of whether the defendant's press was unreasonably dangerous as manufactured (*Doser*, 142 Ill. 2d at 199), and whether that condition was a proximate cause of the plaintiff's injury (*see Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 84, 117 N.E.2d 74), are questions of fact for a jury to decide. Applying the *Pedrick* standard to the instant case, we are unable to say that the evidence introduced at trial, taken in an aspect most favorable to the plaintiff, so overwhelmingly favored the defendant that no verdict for the plaintiff based on that evidence could ever stand. Consequently, we reverse the judgment of the trial court and remand this case for a new trial.

Reversed and remanded.

CAHILL and S. O'BRIEN, JJ., concur.